Nicholson, C. J.,
delivered the opinion of the Court.
Jacob Young died in Robertson county, in October, 1858, having made .his will, which was duly admitted to record. He was an old bachelor, possessed of considerable fortune, consisting of lands, slaves, etc. He provided in his will that his lands and all of his slaves except three, should be sold, and the proceeds divided among his collateral relations. As to three of his slaves, he made a special provision, as follows:
“'4. I will that my three negro’ boys, Calvert, Jerry, and Moses, have the right to choose their masters, and that he pay whatever he pleases, and if they become dissatisfied, that they have the right to choose again, by the last master paying to the first, whatever he paid, and so on; and I request my executors to see to this, as they have been faithful servants to me, and I desire that they shall be well treated.”
The administrator with' the will annexed of Jacob Young hired out these three negroes from 1859 to *21 1864, receiving annually for each, from $100 to $150. He desired to hire them out for 1864, but they had become apprized of the provision for them in the will, and selected their masters for that year, who tendered each to the administrator one dollar. This was refused by him, and consequently the three negroes were not hired out for that year.
In July, 1866, two of these negroes, Calvert and Jerry, together with the administrator of the other, Moses, who had died, filed their bill in the Chancery Court at Springfield, claiming of the administrator of Jacob Young the proceeds of their hire from 1859 to 1863 inclusive, Upon the ground that by a proper construction of the clause of the will quoted above, they were entitled to the money. The administrator denied their right to the fund, claiming it for the dis-tributees of his testator, and first made his defense by demurrer; this being overruled, he answered, denying the claim of complainants, and insisting that by the will they’ were still slaves when the hiring took place, and that the proceeds belonged to the estate of his testator. Upon the hearing, the Chancellor decreed in favor of complainants, but upon appeal to the Supreme Court, the decree was reversed, this Court holding that the demurrer to the bill ought to have been sustained, and the bill dismissed.
A decree was accordingly rendered in this Court in February, 1868, sustaining the defendant’s demurrer, and dismissing the bill.
A petition for rehearing was filed by the complainants, in which the same general ground relied on in *22 the bill, was urged upon the Court, and in addition,, it was alleged that prior to making his will, Jacob Young, by his conduct and his parol declarations, had indicated his assent to the freedom of complainants,, and that upon both grounds the decree ought to be-reheard and reversed. This Court declined to rehear or reverse the decree of dismissal, but directed the same to be modified, by declaring that the dismissal should be “without prejudice.”
In March, 1868, complainants filed another bill in the Chancery Court at Springfield, in which they allege that the testator, Jacob Young, repeatedly declared to complainants and others, that complainants were free, and that they should never be held in slavery after his death, and that they should be entitled to work for themselves, and receive the benefit of their labor, and that his relations should neither hold them in slavery nor receive their labor or hire; that they thus acquired an inchoate right to freedom, which only required the assent of the State to make it perfect. They further allege that by the proper construction of the will of Jacob Young, this inchoate right to freedom was recognized, and that as they have been made free-by the act of the Government, they are now entitled' to the proceeds of their hire received ,by the administrator from the death of the testator down to the time of their emancipation. They allege that the will devolved upon the administrator an express trust, inasmuch as he was requested to see that they should have the benefit of their own labor, and as he chose to disregard the trust and hire them out, he ia *23 liable in equity to account for the proceeds of tbeir hire.
The administrator .filed a demurrer to this bill, assigning several distinct grounds on which he insisted that complainants were not entitled to relief. It is insisted that complainants are precluded by the action of this Court in dismissing their former bill, from relying upon any thing but the allegations as to a parol gift of freedom, made prior to the will, and that these allegations are not sufficient to entitle complainants to relief. Other causes of demurrer are assigned, but the one stated presents the main ground of defense.
The demurrer having been Overruled, the adminis-strator filed his answer in which he denied the several allegations in the bill, and relied on the matters of defense set out in his demurrer. Upon the hearing of the cause upon the pleadings and proof, the Chancellor held that complainants had failed to sustain their allegations, and dismissed the bill. From this decree complainants have brought the case here by writ of error.
The first question presented is, as to the legal effect of the decree rendered by this Court in February, 1868, dismissing the bill “ without prejudice.”
It is insisted for defendant, that the 4th clause of the will of Jacob Young cannot be looked to or relied on in this cause, as it has been already construed against the complainants, and that the question as to the proper construction of the 4th clause of the will is res adjudieata. This would be the legal effect of *24 the decree of February, 1868, but for the amendment made thereto upon the petition for rehearing. The Court ordered the decree to be so modified as not to operate as res adjudicata, by dismissing the bill “without prejudice.” A bill regularly dismissed upon the merits, where the matter has been passed upon, and the dismissal is not without prejudice, may be pleaded in bar of a new bill for the same matter. 1 Danl. Ch. Pl. and Pr. 633, (note.) Here the only object for modifying the decree of dismissal, was to authorize the complainants to file another bill, without being met by the legal consequence of a decree of dismissal on the merits.
The whole question, therefore, as to the construction of the will, and the allegations as to a parol gift of freedom, before the making of the will, is properly in issue in this cause.
• The next inquiry arising as to the proper construction of the 4th clause of Jacob Young’s will. In other words, what was the intention of the testator as to the three negroes, Calvert, Jerry and Moses, as manifested in this clause? In Hoover v. Gregory, 10 Yerg., 444, it is said, that the Court in endeavoring to arrive at a knowledge of the intention of the testator, must take into consideration the circumstances as they existed at the time the will was made. It is abundantly shown in the proof, that the three negroes named in the 4th clause, had served the testator long and faithfully, and that having no wife and children, his attachment for them was as strong, and his confidence in them as great, as if they had been his own children.
*25 Eor years before making his will he manifested constant anxiety as to their condition after his death. To give them their freedom was the purpose uppermost in his mind. The idea that they should ever be held in bondage by any other person was revolting to his feelings. How to consummate his purpose was the subject on which he dwelt repeatedly and earnestly in conversing with his neighbors. When informed by an attorney, whom he consulted, that they could not be made free without leaving the country, he was so deeply affected that he shed tears. To one witness he said many years before he made his will, that the said Calvert, Jerry, and Moses should be set free — that they would be taken care of during his life, and they should never serve any one else after his death. After he made his will, he said that he had left them in the will as ' good as free — that he considered them free, and that the provision in his will would set them free at his death. Before and after he made his will,. he said these boys had made all that was there, and that it was his duty to do all that he could for them. To many other witnesses he expressed his fixed purpose that the three boys should never serve any one else, and that they should be free at his death. When he was told by his attorney that he could not set the boys free by his will, he asked if he could not fix it so that they might remain nominally slaves, but really be free, as the poor fellows did not want to be sent off.
The proof fails to establish an actual gift of freedom to the three negroes before the making of his *26 will; but it shows that their freedom was an object of controling interest with the testator, and develops the reason why he failed to give them their freedom, as well as the circumstances which surrounded him when he made his will.
Looking at the fourth clause of the will, with the light of the circumstances as they existed at the time the will was made, as developed in the proof, we can have no difficulty in arriving at the testator’s intention as to the three negroes named. He clearly intended them to remain nominally slaves, so as not to be obnoxious to the laws of the State in remaining here, but so as to enjoy the benefits of their own labor. They were to choose their own masters — and the masters so chosen were to pay to his estate just what they might please in consideration of the title, and such master was to take the title on condition that the negroes should have the right, if they became dissatisfied, to find other masters who would refund the amount paid by the first master, and take the title— and so on indefinitely, the negroes continuing during their lives nominally slaves, but entitled to the fruits of their labor. And the executor was requested to see that these provisions for the negroes were carried out.
According to the intention of the testator, it was the duty of his executor after accepting the trust, to inform the three negroes of their rights under the will, to choose their masters or owners, and of the terms ón which their new masters were aiithorized to become their owners; that they were to become their *27 masters for a consideration fixed by tbe masters themselves; that for such consideration the executor was to mate titles constituting them the masters of the three negroes, but the masters were to be bound, at the election of the negroes, to convey them to other masters on similar terms; and the executor was to see that the rights and benefits so provided for the negroes should be secured to them from time to time, as often and as long as the negroes might elect to change masters. It is clear that it was the intention and purpose of the testator that the masters of the negroes were to own them as trustees, and that the negroes were to be the beneficiaries, with the substantial rights of free men. The proof shows that from 1859 to 1863, both inclusive, the negroes were deprived of the rights secured to them, and by the action of the executor or administrator, were kept in absolute slavery, being hired out year after year for the full value of their labor as slaves.
In this way a fund of several thousand dollars ■ came into the hands of the administrator, and the question arises, to whom does it belong — to the negroes, or to the distributees of Jacob Young? It is clear that the testator anticipated no such fund as part of his estate, and he has made no disposition of it by his will. If, therefore, it does not belong to the negroes, now that they are free men de jwre as well as de facto, it must belong to the testator's dis-tributees. The settlement of this question must depend upon the validity or invalidity of the fourth clause of the will.
*28 The provisions of the Code were in force when the testator died. By these, the assent of the State to the emancipation of slaves could be given only on condition of removal from the State.
Under the decisions of this Court, in Bridgewater v. Pride, 1 Sneed, 195; Boone v. Lancaster, 1 Sneed, 584, and Cochreham v. Kirkpatrick, 1 Heis., 327, if the fourth clause of Jacob Young’s will was. an absolute bequest of freedom to the three slaves without providing for their removal from the country, it was a nullity, being in violation of the law of the State, and they continued to be slaves. But we have seen that the testator carefully avoided giving to the negroes their absolute freedom, but expressly provides that they shall continue to have masters after his death, and he secures to them rights and benefits, which may enable them ultimately to become absolutely free. It is abundantly proved that the ultimate freedom of the negroes was the paramount purpose of the testator, and but for the state of the law at the time, he would have carried out his purpose directly and immediately. He determined to avoid contravening the law, but to secure to the negroes the substantial benefits of freedom. He took away from his executor and from his distributees all right to control them or to direct their labor, or to receive the proceeds thereof. If this was in anywise inconsistent with the spirit of the laws against their emancipation, it is to be borne in mind that none but the State could raise this objection. In Lewis v. Daniel, 10 Hum., 314, Judge Turley said: “We have heretofore held, that a devise of freedom is *29 a substantial thing, whether it be recognized by the State or not; and that no one but the State can interfere in relation thereto.”
In the case of Laura Jane v. Hagan, 10 Hum., 332, Judge Green said: “It has been uniformly held that a bequest of freedom discharged the person so emancipated from all obligation of service to the legatees or distributees of the testator or his personal representatives, though the assent of the State may not have been obtained.” In Lewis v. Simonton, 8 Hum., 189, Judge McKinney said: “In this State by virtue of statutory prohibition,. emancipation can not take place without the consent of the government; nevertheless, the owner may part with his right of property in the slave as fully as at common law, and thereby invest him with an imperfect right to freedom. This may be done by deed or will, or even by parol, entered into with the slave. * * * But although the right of the slave to freedom is imperfect and incomplete until the assent of the State has been manifested by the proper tribunal; yet the legal character and condition of the slave is changed. By the act of the master imparting to him an imperfect right to-freedom, he ceases to be in the state and condition of slavery; ceases to have an owner or master, within the meaning of the law; and not only may the master by direct contract with the slave, confer upon him an immediate right to present freedom; he may likewise make a conveyance to a third person, in the character of trustee for the slave, as held in the case of Elias v. Smith, 6 Hum., 33, thereby postponing the *30 enjoyment of the right until the happening of some future contingency;” and in Boone v. Lancaster, 1 Sneed, 582, Judge Caruthers said: “This doctrine is now too firmly fixed by a uniform series of decisions to be disturbed, and seems to recognize a kind of intermediate state between freedom and slavery.”
The authorities cited, as well as others that might be referred to, establish t]ie position that there always has been an intermediate state between absolute slavery and absolute freedom, recognized by our Courts, in which intermediate state the inchoate legal right to freedom, and the vested equitable right to its benefits, have been regarded as substantive things, capable of being enforced and consummated in Courts of Equity. It follows, that if the testator, by the fourth clause of his will, conferred upon the three negroes rights and benefits which were inconsistent with any claim to their services as slaves on the part of the administrator or the distributees (thus giving them the substantial benefits of freedom), they thereby occupied an intermediate state between freedom and slavery; and no one could object to their enjoyment of their rights and benefits.
The administrator had a plain duty to perform; the will Avas the law of his conduct in the execution of his trust, and he could escape responsibility in no other way than by faithfully carrying out the directions of his trust. He had no right to refuse to execute the trust because he may have regarded the clause in the will as inconsistent with public policy; this was a question for the State to determine. Nor had the distrib- *31 utees of Jacob Young any interest in the labor or services of the negroes.
In hiring out the negroes, therefore, from 1859 to 1863, both inclusive, the administrator failed to discharge his trust. As the negroes were vested with full freedom by the act of the government - in 1865, they then had a right to come into a Court of Equity to assert their rights. They have made out a clear case for equitable relief. They were kept in absolute slavery by the administrator, in violation oí their rights under the will of their former owner, and probably in ignorance thereof until 1864. The fund in the hands of the administrator was produced by their own labor while so held in slavery — labor which, under the will, they had a right to control. No others than themselves have any equitable claim to the fund.
The decree of the Chancellor is reversed, and a decree rendered for an account, which will be taken and reported to the present term.
EkeemaN, J., dissented.